**NEW CINGULAR WIRELESS PCS LLC, et al., Plaintiffs,**

v.

**Michael PICKER, et al., Defendants.**

**Case No. 16–cv–02461–VC**

United States District Court, N.D. California.

Signed November 3, 2016

Matthew Henry Marmolejo, Mayer Brown, LLP, Henry Weissmann, Christa Leigh Culver, Fred Anthony Rowley, Thane Rehn, Munger Tolles & Olson LLP, Los Angeles, CA, Michael K. Kellogg, Collin R. White, Scott Harris Angstreich, Kellogg, Huber, Hansen, Todd, Evans and Figel, P.L.L.C., Peter Karanjia, Davis Wright Tremaine LLP, Washington, DC, Christian Frederick Binnig, J. Covey Tyson, Jay Tyson Covey, Mayer Brown LLP, Chicago, IL, David P. Discher, David Jeffrey Miller, Gregory Lee Castle, Isabelle Marie Salgado, AT & T Services, Inc., Oakland, CA, Lesla Jean Lehtonen, California Cable & Telecommunications Association, Sacramento, CA, Martin L. Fineman, Suzanne Kathleen Toller, Davis Wright Tremaine LLP, Rees Ferriter Morgan, Richard Ralph Patch, Coblentz, Patch, Duffy & Bass LLP, Margaret L. Tobias, Tobias Law Office, Michael B. Day, Goodin MacBride Squeri & Day LLP, Rudolph Munguia Reyes, Jr., Verizon Wireless, San Francisco, CA, for Plaintiffs.

Christine Jun Hammond, Christopher Paul Witteman, Helen Marie Mickiewicz, Kimberly June Lippi, California Public Utilities Commission, Christine Ann Mailloux, The Utility Reform Network, San Francisco, CA, for Defendants.

## ORDER RE SUMMARY JUDGMENT

VINCE CHHABRIA, United States District Judge

Both the Federal Communications Commission ("FCC") and the California Public Utilities Commission ("CPUC") have authority to regulate telecommunications companies in California. The CPUC recently initiated a proceeding to evaluate the quality, availability, and price of telephone and Internet service for California residents. It ordered the telecommunications companies to disclose geographic subscription data, under a protective order, to participants in the proceeding, so those participants can fully weigh in on the issues the CPUC is considering. The telecommunications companies contend this disclosure requirement conflicts with, and therefore is preempted by, federal law, even though the FCC itself requires similar disclosures in its own proceedings. The motion for summary judgment filed by the companies is denied, because the CPUC's decision to require disclosure of these data to third parties under a protective order does not, in itself, conflict with federal policy.

But the CPUC and The Utility Reform Network have not yet demonstrated that the protective order adequately guards against public disclosure of commercially sensitive data that would cause competitive harm to the companies. If it does not adequately guard against this type of disclosure, there is at least a possibility it could be preempted. Therefore, the cross-motions for summary judgment filed by the CPUC and TURN are denied as well.

### I.

With the passage of the Communications Act of 1934, Congress created the FCC. In the decades that followed, the FCC primarily regulated long-distance telecommunications rates, while state utilities commissions regulated local rates. *Qwest Corp. v. Ariz. Corp. Comm'n*, 567 F.3d 1109, 1112 (9th Cir. 2009). There was little competition in either the long-distance markets or the local markets. *Id.*

The boundary between these two regulatory spheres blurred over time. *Id.* Ultimately, with the Telecommunications Act of 1996, Congress significantly expanded federal authority. Pub. L. No. 104–104, 110

Stat. 56. The 1996 statute instructed the FCC to open competition in all telecommunications markets, including previously monopolized local markets. *Qwest Corp.*, 567 F.3d at 1113. In other words, Congress sent the FCC into a regulatory arena previously occupied mainly by the states.

But Congress did not simultaneously kick the states out of that arena. To the contrary, Congress made clear that it envisioned the FCC and state commissions both exercising regulatory authority:

> The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

47 U.S.C. § 1302(a); *see also Glob. Naps, Inc. v. Mass. Dep't of Telecomms. & Energy*, 427 F.3d 34, 46 (1st Cir. 2005) ("The model under the TCA is to divide authority among the FCC and the state commissions in an unusual regime of 'cooperative federalism,' with the intended effect of leaving state commissions free, where warranted, to reflect the policy choices made by their states." (internal citation omitted)). Thus, the 1996 statute envisioned both the FCC and state utilities commissions exercising regulatory authority over companies that provide local telecommunications services.

Not long after Congress passed the 1996 statute, the FCC began collecting data from telecommunications companies, including companies that provide Internet and local telephone service. The FCC described the launch of this data collection program in an order issued in 2000 titled "In the Matter of Local Competition and Broadband Reporting." 15 FCC Rcd. 7717 ("2000 Reporting Order"). In its order, the FCC explained: "By collecting timely and reliable information about the pace and extent of competition for local telephone service in different geographic areas—including rural areas—we significantly improve our ability to evaluate the effectiveness of actions the Commission and the states are taking to reduce economic and operational barriers to entry into those local markets." *Id.* at 7718–19. The 2000 order required telecommunications companies to provide data to the FCC through a standardized form, "FCC Form 477." *Id.* at 7718.

From the outset, telecommunications companies expressed concern about public disclosure of some of the data the FCC proposed to collect. In particular, companies worried that subscription data would show which people, in which places, were getting telecommunications services from which companies. As the FCC described it, the companies expressed concern about "the potential for competitive harm that release of the gathered data could cause and, in particular, about the ability of competitors to take the data submitted and tailor market strategies to quash nascent competition, protect areas that are being subjected to increased competition, or deploy facilities to defend strongholds." *Id.* at 7758.

In its 2000 order, the FCC considered and addressed the companies' concerns about public disclosure of granular subscription data. The FCC noted that it already had procedures in place to ensure that, in other contexts, when a member of the public sought information from the FCC under the Freedom of Information Act, any commercially sensitive informa-

tion would be excluded from disclosure. Under these preexisting procedures, a company providing information to the FCC could request confidential treatment of the information, and the FCC would honor that request "to the extent [the company] can show by a preponderance of the evidence a case for non-disclosure consistent with the Freedom of Information Act." *Id.* (citing 47 C.F.R. § 0.459). The FCC explained that the "Form 477 data" would be subject to these protections as well. The FCC provided a box for companies to check in Form 477 if they wished to request that their data remain confidential, with the understanding that the FCC would ultimately make the decision about confidentiality in the event of a Freedom of Information Act request. *Id.* at 7758–59. The rules governing the FCC's treatment of confidential information generally, and Form 477 data specifically, are discussed more fully in Section III.

In its 2000 order regarding Form 477, the FCC also responded to arguments that it should not start collecting these data, since some state commissions already conducted similar data collection efforts. "We recognize," the FCC stated, "that various states have implemented local competition reporting requirements and that some of these state programs ask for information similar to that we seek here." *Id.* at 7728. But the FCC concluded that state-level data collection efforts were not an adequate substitute because reporting requirements differed from state to state, and the FCC could not be assured that mere reliance on state data collection efforts would give it the comprehensive information it needed to fulfill its duties under the 1996 statute. *Id.* The FCC recognized that states would likely continue their own data collection efforts, but expressed hope that states might eventually start piggybacking on the FCC's data collection, which would make life easier for the telecommunications companies:

We remain convinced that a properly designed federal program can complement state efforts and end up reducing the reporting burdens imposed, overall, on carriers.... With access to this information, some states may find it possible to revise their existing reporting requirements or to refrain from adopting new or additional requirements.

*Id.* at 7728–29. In furtherance of this goal, the 2000 order made clear that the FCC would share these data with state commissions, so long as the state "has appropriate protections in place.... that would preclude disclosure of any confidential information." *Id.* at 7761. The FCC emphasized that "where state laws afford less protection than federal FOIA laws, the higher federal standard will prevail." *Id.*

Over the years, tension has continued to exist between the FCC and regulated companies over the handling of commercially sensitive information. This tension flared up in 2015 during the FCC's review of the proposed acquisition of Time Warner Cable by Charter Communications. The companies complained that participants in the FCC proceedings regarding the proposed acquisition, including those who were objecting to the proposed acquisition, should not be allowed to review commercially sensitive information submitted by the companies—even if the review was subject to a protective order. The FCC rejected this argument, explaining that for years it had allowed third parties to review commercially sensitive data under a protective order and that review of confidential information subject to a protective order by a third-party participant in a regulatory proceeding was categorically different from public disclosure pursuant to the Freedom of Information Act:

While we recognize that parties have a legitimate concern that their competitively sensitive and other confidential in-

formation not be made available to their competitors, those with whom they do business, or the general public, we find that the risk of harm in allowing commenters to review that information pursuant to our protective orders is small. Our protective orders limit disclosure to counsel and outside experts who are not involved in competitive decisionmaking or involved in a business relationship with the submitting party, and they limit the use of the information to the current proceeding. Persons who seek to review confidential information under a protective order must be a representative of a participant in the proceeding. We will not permit access to confidential materials by anyone who is not participating in the proceeding in good faith or by someone who we have good reason to believe will not be using the information for proper purposes. The protective orders provide sanctions for violations that may include suspension or disbarment of counsel or expert consultants from practice before the Commission, forfeitures (monetary penalties), cease and desist orders, and denial of further access to confidential information in that or other Commission proceedings. Any false statement made to the Commission in order to obtain information subject to a protective order may be criminally punishable.

Order, *In the Matter of Applications of Charter Communications, Inc. Time Warner Cable Inc., and Advance/Newhouse Partnership for Consent to Assign or Transfer Control of Licenses and Authorizations*, 30 FCC Rcd. 10360, 10367–68 (2015) ("Charter/Time Warner Order") (footnotes omitted).

On the flip side, the FCC emphasized the value of allowing participants in its proceedings to review confidential information under a protective order, stating that "public participation in Commission proceedings cannot be effective unless meaningful information is made available to interested parties." *Id.* at 10366–67 (quoting in part Notice of Inquiry and Notice of Proposed Rulemaking, *In the Matter of Examination of Current Policy Concerning the Treatment of Confidential Information Submitted to the Commission*, 11 FCC Rcd. 12406, 12422 (1996)); *see also* Charter/Time Warner Order, at 10367 (quoting Report and Order, *In the Matter of Examination of Current Policy Concerning the Treatment of Confidential Information Submitted to the Commission*, 13 FCC Rcd. 24816, 24844 (1998)) (highlighting the need " 'to ensure that interested parties have a full opportunity to participate in the proceeding by providing a different perspective on materials that may be relied upon by the agency,' thus aiding our understanding and allowing us to reach a better result").

## II.

The dispute in this case is also about commercially sensitive information. But it arises from an attempt by the CPUC to exercise its own authority—preserved by Congress in the Telecommunications Act of 1996—to investigate and regulate telecommunications companies within the state. In November 2015, in response to recent changes in the telecommunications landscape, the CPUC initiated an investigation of whether competition has "been sufficient to deliver reliable communications service at just and reasonable prices." Order Instituting Investigation to Assess the State of Competition Among Telecommunications Providers in California, and to Consider and Resolve Limited Rehearing of Decision (D.) 08–09–042 at 9, I.15–11–007 (Nov. 12, 2015), Compl. Ex. B, ECF No. 1–2. Among the questions the CPUC seeks to answer are:

- "Is the competitive picture in the business market different than in the residential market, and how have both

markets changed over the last decade?"

- "How have these changes affected customer choice of providers and services?"
- "Is competition in rural areas less robust than in urban areas?"
- "Has competition produced a safe and reliable network?"

*Id.* at 14.

As part of its investigation, the CPUC has required the telecommunications companies to provide data comparable to some of the commercially sensitive data the FCC collects through Form 477. Specifically, the CPUC has ordered the companies to provide subscription information, at the census block level, to allow a geographic assessment of the state of competition for telecommunication services throughout California. Furthermore, third parties participating in the proceedings sought some of the same data, subject to a protective order in the investigation. One of the parties requesting access to the data was The Utility Reform Network, commonly known as TURN, which describes itself this way on its website: "For more than 40 years we have challenged California's powerful energy and telephone companies, saving consumers and small businesses millions, standing up for vulnerable Californians, and demanding reliable service and livable communities."[1] Another party requesting access to the data was the Writers Guild of America, West, which has an economic interest in the outcome of the proceeding because it negotiates with Comcast and potentially other communications carriers and seeks a competitive market for its members' content.

Many of the telecommunications companies objected to this disclosure to third parties, so an administrative law judge and assigned CPUC commissioner were called upon to resolve the dispute. The judge and assigned commissioner ruled that the companies had to disclose the subscription data to TURN, subject to the protective order in the investigation. Ruling at 5–6, *Order Instituting Investigation*, 1.15–11–007 (May 3, 2016), Toller Decl. Ex. 8, ECF No. 8–9. They also ruled that the Writers Guild could access the data, but only if it complied with the requirements imposed on competing carriers in the investigation to "hire independent counsel completely divorced from [its] commercial decision-making, in order to review the Highly Confidential Information at issue here." *Id.* at 7–8. Under the protective order, the outside counsel "must file an Acknowledgement of confidentiality and of the duty not to communicate this information to clients before obtaining access to the data." ALJ Ruling on Remaining Protective Order Issues at 11, *Order Instituting Investigation*, I.15–11–007 (Apr. 1, 2016), Compl. Ex. E, ECF No. 1–4. "Outside counsel must also certify that s/he is not involved in 'Competitive Decision–Making' for the client, will not use the materials for any purpose other than this proceeding, and will return or destroy the data at the end of the proceeding." *Id.* at 12. The protective order sets out sanctions for violations. Protective Order ¶ 16, *Order Instituting Investigation*, 1.15–11–007 (Mar. 4, 2016), Compl. Ex. D, ECF No. 1–3.

The telecommunications companies then filed this federal lawsuit against the CPUC. They contended that the CPUC's requirement to disclose the subscription data to TURN and other participants in the investigative proceeding under a protective order conflicts with (and therefore is preempted by) federal law. TURN intervened in the case as a defendant, to protect its interest in accessing the subscription data. The companies sought a

---

1. *About Us,* The Utility Reform Network,   http://www.tum.org/about.

preliminary injunction to prevent the disclosure until the dispute could be adjudicated on the merits.[2]

The Court ruled that although the preemption question didn't seem easy, the CPUC and TURN "did not meaningfully address" several key issues affecting the preemption analysis, so the companies had established a likelihood of success on the merits "at this early stage in the process." Order Granting Motion for a Preliminary Injunction at 3, ECF No. 65. And because the companies easily satisfied the other three parts of the test for obtaining a preliminary injunction, the Court granted the motion. *Id.* at 3–4. The result was that the companies were relieved from the obligation to provide the subscriber data to TURN and other participants in the CPUC investigative proceeding until the preemption question was adjudicated on the merits.

The parties have now filed cross-motions for summary judgment on whether the CPUC's requirement to disclose the subscription data under a protective order is preempted by federal law.

## III.

As discussed in Section I (and as discussed further below), the FCC has adopted a number of policies and procedures relating to the data it collects from telecommunications companies through Form 477. The upshot is that when a company discloses data to the FCC through Form 477, the company can expect the FCC to protect commercially sensitive data from public disclosure or from other types of disclosure that would cause competitive harm, but the company should also expect the FCC to disclose commercially sensitive data to appropriate third parties, under a protective order, as part of regulatory proceedings.

In this case, the companies argue that when a state commission is exercising its own power to conduct its own regulatory proceeding, it may not permit third parties participating in the proceeding to review commercially sensitive data under a protective order. The companies argue that the CPUC, by requiring disclosure of subscription data to TURN and others, is acting contrary to federal policy, such that the order requiring disclosure is preempted.

There are two related problems with the companies'; argument. First, every statement the companies cite from the FCC relating to treatment of commercially sensitive data is about the data the FCC itself collects through Form 477. Not one of the FCC's statements purports to regulate how state agencies must handle data they collect separately as part of their own legitimate regulatory proceedings. This despite the FCC's recognition that separate state data collection efforts would continue after the FCC had implemented the Form 477 program. Second, the FCC's statements about data it collects through Form 477 focus singularly on protection of commercially sensitive data from the kind of disclosure that would cause competitive harm, without any indication of concern about disclosure under a protective order to participants in a regulatory proceeding. Indeed, the FCC has made clear that disclosure under a protective order to participants in a regulatory proceeding is appropriate. For these reasons, it would be difficult to conclude that a state commission impedes federal policy by requiring, in the legitimate exercise of its own regulatory au-

---

**2.** The companies also included a claim that the disclosure requirement violates the Fourth Amendment, but they appear to have abandoned this argument, presumably because it is so obviously without merit.

thority, the disclosure of commercially sensitive data under a protective order to appropriate participants in the state regulatory proceeding.

### A.

A state law or state action is preempted if it operates in a field occupied by federal law or if it conflicts with federal law. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). The companies assert "conflict preemption" here. A state law or action "conflicts" with federal law if it stands as an obstacle to the accomplishment of a federal interest or objective. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995); *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941); *Qwest Corp.*, 567 F.3d at 1118. This is a circumstance-specific inquiry. *Hines*, 312 U.S. at 67, 61 S.Ct. 399. The first step is to "ascertain the nature of the federal interest." *Hillman v. Maretta*, —— U.S. ——, 133 S.Ct. 1943, 1950, 186 L.Ed.2d 43 (2013).

### B.

For their argument that the CPUC's disclosure order stands as an obstacle to the accomplishment of a federal objective, the companies rely heavily on 47 C.F.R. § 1.7001, which is the regulation adopted by the FCC to govern its collection of data through Form 477. The title of the regulation is: "Scope and content of filed reports." Paragraph (a) contains a number of definitions. Paragraph (b) provides that telecommunications companies and others must "file with the Commission a completed FCC Form 477." Paragraph (c) requires anyone who files a Form 477 to include with the filing "a certification signed by an appropriate official." The language of paragraph (d) is most relevant here, discussing "[d]isclosure of data contained in FCC Form 477."

Paragraph (d) contains four subparagraphs. Paragraph (d)(1) specifies that "[e]mergency operations contact information" submitted through Form 477 is automatically protected from disclosure, referring back to the FCC's preexisting rules that identify the type of information that shouldn't be provided in response to Freedom of Information Act requests. Paragraph (d)(2) provides that companies submitting data through Form 477 may ask the Commission to protect other enumerated types of data from Freedom of Information Act requests, including "[p]rovider-specific subscription data." Paragraph (d)(3) provides that companies may also seek confidential treatment of "any other data contained in FCC Form 477," and again refers back to preexisting FCC rules and procedures for obtaining protection from Freedom of Information Act requests. Finally, paragraph (d)(4) makes clear that the FCC (not the companies) "shall make all decisions regarding nondisclosure of provider-specific information," except that a bureau within the FCC (the Wireline Competition Bureau) may release provider-specific information on its own to:

(i) A state commission provided that the state commission has protections in place that would preclude disclosure of any confidential information,

(ii) "Eligible entities," as those entities are defined in the Broadband Data Improvement Act, in an aggregated format and pursuant to confidentiality conditions prescribed by the Commission, and

(iii) Others, to the extent that access to such data can be accomplished in a manner that addresses concerns about competitive sensitivity of the data and precludes public disclosure of any confidential information.

The companies place great weight on a wording difference between the above-quoted paragraphs (d)(4)(i) and (d)(4)(iii).[3] They note that the Wireline Competition Bureau may release data to state commissions under paragraph (d)(4)(i) if they have protections that would preclude "disclosure" of confidential information, whereas the Bureau may release data under paragraph (d)(4)(iii) to unspecified "others" so long as it can be done in a manner that ensures against "public disclosure" of the information. They read into this distinction an intent by the FCC to impose more onerous restrictions on state commissions, preventing them from disclosing Form 477 data to anyone under any circumstances, while unspecified "others" are subject to a lesser restriction, namely, the requirement that they merely avoid disclosure of confidential information to the "public." The companies rely on the principle that when a word is included in one statutory or regulatory provision but excluded in another, meaning must be ascribed to that difference. *See Dean v. United States*, 556 U.S. 568, 573, 129 S.Ct. 1849, 173 L.Ed.2d 785 (2009).

But the remaining language in the regulation, not to mention the FCC's use of similar language elsewhere, belies this conclusion. When the FCC generically uses the word "disclosure," it is referring, in shorthand, to public disclosure, not the type of disclosure contemplated by review of data under a protective order as part of a regulatory proceeding. And when it uses the word "confidential," it is juxtaposing that concept against public disclosure, not against a disclosure pursuant to a protective order.

For example, paragraph (d)(2) of the regulation refers generically to "non-disclosure" when it allows companies to request protection of specified data against Freedom of Information Act requests. Disclosure under the Freedom of Information Act is, by definition, public disclosure, so the FCC's use of "non-disclosure" in paragraph (d)(2) could only have been in reference to protection from public disclosure. Similarly, when paragraph (d)(3) provides that companies may request that "other data" remain "confidential," it is referring to avoidance of public disclosure under the Freedom of Information Act. Given this usage throughout the regulation, there's no reason to assume that the similar usage in paragraph (d)(4)(i) meant something other than public disclosure.

Further, as mentioned in Section I, the FCC's 2000 order announcing the creation of the Form 477 program speaks solely of protecting against disclosure that would cause competitive harm and specifies in its paragraph on sharing data with state commissions that "where state laws afford less protection than federal FOIA laws, [that is, laws about public disclosure,] the higher federal standard will prevail." 2000 Reporting Order, at 7761. The confidentiality discussion in the 2000 order was all about balancing the need to maintain "confidentiality" against the need for "the public" to obtain information. *Id.* at 7758 ("Our rules for requesting non-disclosure of competitively sensitive information afford sufficient protection to providers and appropriately balance the concerns of parties submitting information with the interests of the public in obtaining access to that information.").

Indeed, when the FCC was considering the creation of the Form 477 program, the companies submitted comments in which the only confidentiality-related concern they expressed was with disclosure to competitors or to the public, even though they used words like "confidential" and "protec-

**3.** Paragraph (d)(4)(i) was adopted in 2000. 65 Fed. Reg. 19,675, 19,685 (Apr. 12, 2000). Paragraph (d)(4)(iii) was adopted in 2013. 78 Fed. Reg. 49,126, 49,148 (Aug. 13, 2013).

tion" generically (just as the FCC did throughout the regulation that it ultimately adopted). In a submission to the FCC, AT & T complained that "[p]ublic disclosure of such information would be unprecedented." AT & T Corp., Comments in the Matter of Local Competition and Broadband Reporting 17 (Dec. 3, 1999).[4] The Association for Local Telecommunications Services complained: "The information sought by the Commission could be quite damaging when a new carrier has just entered a market and information about the number of lines or customers is released to competitors or the public." Ass'n for Local Telecomms. Servs., Comments in the Matter of Local Competition and Broadband Reporting 12 (Dec. 3, 1999).[5] Nextel asserted: "Subscriber Information is Proprietary and Confidential, and Should not be Made Publicly Available." Nextel Commc'ns, Inc., Comments in the Matter of Local Competition and Broadband Reporting 3 (Dec. 3, 1999).[6]

And the FCC has since made clear that disclosure under a protective order to an appropriate participant in a regulatory proceeding does not implicate the concern with competitive harm caused by public disclosure of proprietary information. *See* Charter/Time Warner Order, at 10361–62 ("[W]hile we are very sensitive to the competitive concerns of parties whose information may be before us, we find that our protective orders are sufficient to protect the confidentiality of even highly competitively sensitive information and that the risk of competitive injury is therefore minimal.").

Against this backdrop, there is only one reasonable interpretation of 47 C.F.R. § 1.7001(d): it is unambiguously and sin-

gularly focused on protecting against the competitive harm that could result from public disclosure of confidential information. Nothing in this paragraph was intended to prevent state commissions from using Form 477 data they receive from the FCC the same way that the FCC itself uses those data—by allowing appropriate participants in regulatory proceedings to review the data under a protective order.

Even if the regulation could somehow be deemed ambiguous as to state commissions' use of Form 477 data obtained from the FCC, and even if one potential interpretation of the ambiguous regulation would be to bar state commissions from using Form 477 data in the way that the FCC itself uses it, that wouldn't be of much help to the companies in this case. What's also clear about the regulation is that it speaks only to the treatment of data received by the FCC from companies through the Form 477 program. There is no indication that the FCC, through this regulation titled "Scope and content of filed reports," also intended to restrict the practices of state entities with respect to any similar information those entities might collect themselves in the legitimate exercise of their own regulatory power. Indeed, as already discussed, in its 2000 order announcing the adoption of the Form 477 program, the FCC recognized that some states already engaged in similar data collection efforts and that they would continue to do so. *See* 2000 Reporting Order, at 7728–29.

In response to this point, the companies focus on the prefatory portion of paragraph (d)(4)—the portion specifying that the Commission "shall make all decisions

---

**4.** Available at https://ecfsapi.fcc.gov/file/6010250986.pdf.

**5.** Available at https://ecfsapi.fcc.gov/file/6010251321.pdf.

**6.** Available at https://ecfsapi.fcc.gov/file/6010251287.pdf.

regarding non-disclosure of provider-specific information" other than the specified decisions delegated to the Wireline Competition Bureau. 47 C.F.R. § 1.7001(d)(4). But it should be clear by now, from the remaining language in the regulation and the context in which the FCC adopted it, that this portion of paragraph (d)(4) refers to decisions about disclosure of information in response to Freedom of Information Act requests—that is, public disclosure. The language refers to the fact that the Commission (not the companies themselves, and not, with certain exceptions, the Wireline Competition Bureau) will make the decision about the confidentiality of Form 477 data that the Commission receives. The companies may not insist that any data remain protected from Freedom of Information Act requests; they may only ask the FCC for that protection, and the FCC will make the decision. There is no reason to believe that the FCC also meant to say that it will make all decisions about the confidentiality of any similar data state regulatory agencies throughout the country may separately collect in the exercise of their own regulatory powers. If the FCC had wished to regulate how state commissions may handle the data that they would continue (as everyone recognized) to collect on their own, it would have tried to do so far less obtusely, adopting a regulation that says something like: "If state agencies continue to collect data similar to what we collect through Form 477, they may not provide that data to anyone outside the agency without our permission."

At oral argument, it became clear just how badly the companies are overreaching in their assertion that the FCC meant to require state entities to seek federal permission before allowing parties to view subscription data under a protective order. When counsel for the companies was asked if this meant a state *court* would be required to get sign-off from the FCC before allowing discovery of commercially sensitive information under a protective order (say, in antitrust litigation or in a class action alleging fraud against subscribers), he responded that this is what the language of the regulation seems to require. Hr'g Tr. 7:23–9:4. Counsel gets points for candor—indeed there would be no basis to argue that there is a "state court exception" to the FCC's alleged insistence that it "shall make all decisions" about disclosure of any subscription data under the sun. But to suggest that the FCC intended to require state courts to seek permission of a federal regulatory agency before requiring a telecommunications company to disclose data in litigation under a protective order (and sought to accomplish this goal so obtusely in a regulation that, by its title and its terms, speaks only to data the FCC directly receives from companies) is to pour the last shovel of dirt on the grave of the companies' argument about the meaning of 47 C.F.R. § 1.7001.[7]

## C.

Aside from the regulation and orders discussed above, the companies have relied primarily in this lawsuit on one other thing: a sentence in a standard letter

7. The CPUC and TURN argue for the application of the presumption against preemption. The question of whether the presumption applies in this context is a difficult one. On the one hand, the presumption against preemption does not apply in the related area of long-distance telecommunications because it is an area with a long history of significant federal presence. *Ting v. AT & T*, 319 F.3d 1126, 1136 (9th Cir. 2003). On the other hand, as discussed in Section I, the states have long had a role in regulating local communications. In this case, the presumption against preemption doesn't matter because the answer to the preemption question is so clear. But there is at least a fair argument that the presumption applies, which further militates against the companies' expansive preemption position.

agreement that the Wireline Competition Bureau has sometimes used to govern the FCC's sharing of Form 477 data with state commissions. The version of the standard data-sharing agreement that the Bureau was posting on its website at the time the lawsuit was filed included the following sentence:

> Subject to the aforementioned restrictions and your signature on this letter affirming that these restrictions will be observed by you and the [name of state commission] generally, and also that the requested data will not be shared with any individuals who are not direct employees of the [name of state commission], we determine that the sharing of the requested information will not constitute "release" to the public within the meaning of the Freedom of Information Act.

*FCC Form 477 Data–Sharing Agreement with State Regulatory Commission*, Compl. Ex. A, ECF No. 1–1. Focusing on the language in this sentence requiring state commissions to affirm that they would not share Form 477 data received from the FCC with anyone who was not a direct employee, the companies argued that the Bureau's standard data-sharing agreement supported their position that federal law preempts a state commission from doing what the CPUC is trying to do in this case.

The companies' reliance on this sentence has diminished as the lawsuit has progressed. They relied on it quite heavily in their preliminary injunction papers, essentially leading with it. But after the preliminary injunction motion was adjudicated, the CPUC clarified that it never actually signed that version of the form agreement. Rather, the CPUC signed an earlier version of the agreement that did not include this sentence.

So the companies placed somewhat less emphasis on this sentence in their summary judgment papers. But they contended that it remained relevant because it continued to give meaning to 47 C.F.R. § 1.7001 and the FCC's related orders. Specifically, the companies contended that to the extent the regulation was ambiguous or silent on whether state commissions may require disclosure of subscription data to third parties under a protective order in connection with a regulatory proceeding when the data has not been received from the FCC, this sentence in the data-sharing agreement "filled the interstices" of the FCC's regulatory regime. *See Fournier v. Sebelius*, 718 F.3d 1110, 1121 (9th Cir. 2013); *see also United States v. Mead Corp.*, 533 U.S. 218, 229–33, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

Then, after the hearing on the motions for summary judgment, the Wireline Competition Bureau updated the sample data-sharing agreement. The current version omits the language on which the companies were relying.[8] As a result, the companies' argument about how this sentence in the data-sharing agreement fills the "interstices" of the regulatory scheme—an argument that already had its share of problems—is gone.

The companies now contend that other language in the data-sharing agreement— language that was present in both the old and new versions—supports their expansive interpretation of the regulation. To the contrary, the language they now point to only confirms the more limited interpretation adopted in this ruling. The data-sharing agreement is singularly focused on ensuring that state commissions avoid *public* disclosure of sensitive data and on making clear that if a state's public disclosure laws are less protective of sensitive data than federal law, federal law will govern.[9]

---

**8.** Available at http://www.fcc.gov/file/11619/download.

**9.** In fact, in a different context, the FCC appears to have taken the position that if the

## IV.

For the reasons discussed above, the motion for summary judgment filed by the companies is denied. Federal law does not preempt state commissions from requiring, under an appropriate protective order and in connection with a regulatory proceeding, disclosure of subscription data to parties participating in that proceeding.

This is not to say that the FCC's regulations and orders in this area could never have a preemptive effect. To recall, a state law or policy is preempted if it stands as an obstacle to the accomplishment of a federal purpose. *See Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). One key purpose of 47 C.F.R. § 1.7001 and related FCC orders, without question, is to protect companies against competitive harm they could suffer if competitors obtained commercially sensitive information such as subscription data. Thus, to the extent the CPUC contends it can do whatever it wants with subscription data it collects on its own, simply because section 1.7001 speaks only to Form 477 data received directly from the FCC, that argument seems questionable. Although the regulation speaks only to data the FCC receives directly from the companies, that regulation and many FCC orders reflect a protective purpose that would be undermined if the CPUC were collecting similar data on its own and then treating it in a way that would cause competitive harm to the telecommunications companies. The point here is merely that the FCC did not intend, in this regulation about the data it receives through Form 477, to require

states collect or use data in a way that undermines federal policy, it is the companies that should seek help from the FCC (rather than the states seeking permission from the FCC beforehand). Memorandum Order and Opinion, *In the Matter of National Association of Regulatory Utility Commissioners Petition for Clarification or Declaratory Ruling that No*

state entities to seek its permission about how to use similar data that they collect on their own.

In their complaint, the companies make the narrower contention that the protective order in the CPUC's investigation is inadequate to protect against the kind of disclosure that would result in competitive harm. Although the companies did not pursue this argument in their motion for summary judgment, the CPUC and TURN have not yet made a showing about the adequacy of the protective order in this case. If the protective order is inadequate, perhaps it is subject to federal preemption. Or perhaps an inadequate protective order would merely violate other laws protecting trade secrets, in which case it would not be covered by the companies' preemption claim. At this stage, because CPUC and TURN have not made a showing on this issue, their cross-motions for summary judgment are denied as well.

A telephonic case management conference will take place on November 22, 2016 at 2:30 p.m. to discuss how to adjudicate this remaining issue. The parties should submit a case management statement by November 15, 2016 providing their views on this issue.

**IT IS SO ORDERED.**

*FCC Order or Rule Limits State Authority to Collect Broadband Data,* 25 FCC Rcd. 5051, 5055 (2010) ("[T]o the extent that State data collection regimes thwart any federal policies or requirements, providers may petition the Commission to preempt any conflicting State regulation.").