Filed 12/20/22; Modified and Certified for Partial Pub. 1/18/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CALAVERAS TELEPHONE COMPANY et al., Petitioners, v. PUBLIC UTILITIES COMMISSION, Respondent; PUBLIC ADVOCATES OFFICE OF THE PUBLIC UTILITIES COMMISSION et al., Real Parties in Interest. | F083339 (Dec. Nos. 21-04-005 & 21-08-042) |

ORIGINAL PROCEEDINGS; petition for writ of review.

BRB Law, Patrick M. Rosvall and Sarah J. Banola for Petitioners.

Arocles Aguilar, Mary McKenzie and Tovah Trimming for Respondent.

Lozeau Drury, Michael R. Lozeau; The Utility Reform Network and Ashley L. Salas for Real Party in Interest The Utility Reform Network.

No appearance for Real Parties in Interest Public Advocates Office of the Public Utilities Commission and Stephen Kalish

-ooOoo-

The Public Utilities Commission (the Commission or PUC) oversees the California High Cost Fund A program (CHCF-A), which provides subsidies to small, rural, independent telephone companies that provide local telephone service in rural and remote areas of California. The subsidies defray the high cost of providing service in such areas. More recently, the subsidies have helped the telephone companies invest in infrastructure capable of providing both regulated voice telephone service and unregulated broadband Internet access service. The fact a broadband-capable network can provide both types of service created a concern that the telephone companies could sell wholesale broadband service to affiliated companies at artificially low rates and the affiliated companies could profit by selling Internet access service at the retail level. In other words, subsidized infrastructure could be used to generate private, unregulated profits.

The Legislature addressed this concern by amending Public Utilities Code section 275.6,[1] the statute that governs the CHCF-A, to authorize the Commission to obtain information from the telephone companies about "revenues derived from the provision of unregulated internet access service by that [company] or its affiliate." (§ 275.6, subd. (e)). Also, the Commission must ensure the CHCF-A subsidies are "not excessive." (§ 275.6, subd. (c)(7).) Relying on section 275.6, the Commission ordered the imputation of net positive retail broadband Internet access service revenues of the telephone companies and their affiliates (broadband imputation) in the calculation of the CHCF-A subsidies.

Ten small rural telephone companies that participate in CHCF-A subsidies filed this writ proceeding to nullify the Commission's broadband imputation order. They contend broadband imputation (1) is not authorized by section 275.6, (2) exceeds the

---

[1]     Undesignated statutory references are to the Public Utilities Code.

authority granted to the Commission by other statutes and the California Constitution, (3) is preempted by federal law, and (4) is an unconstitutional taking of private property. As explained below, we reject these arguments.

Therefore, the telephone companies' request for a writ directing the Commission to nullify its broadband imputation order is denied.

## FACTS AND PROCEEDINGS

*The Parties*

This original proceeding was brought on behalf of 10 small independent telephone companies and eight small Internet service providers (ISP) affiliated with those telephone companies. The telephone companies are Calaveras Telephone Company; Cal-Ore Telephone Co.; Ducor Telephone Company; Foresthill Telephone Co.; Kerman Telephone Co.; Pinnacles Telephone Co.; The Ponderosa Telephone Co.; Sierra Telephone Company, Inc.; The Siskiyou Telephone Company; and Volcano Telephone Company. They are referred to collectively in this opinion as the "telephone companies."[2] The telephone companies are carriers of last resort that must fulfill all reasonable requests for telephone service within their service areas. (§ 275.6, subd. (b)(1).) As carriers of last resort, the telephone companies qualify for CHCF-A subsidies. (§ 275.6, subds. (a), (d).) The CHCF-A program is funded by surcharges assessed against all California telephone customers.

The telephone companies' affiliates that provide Internet access service are CalTel Connections; Cal-Ore Communications; Varcomm Broadband, Inc.; Audeamus LLC; Ponderosa Cablevision; Sierra Tel Internet; Golden Bear Broadband LLC; and Volcano

---

**2**     Small independent telephone corporations are rural incumbent local exchange carriers (i.e., a company that provides local telephone service) regulated by the Commission. (§ 275.6, subd. (b)(6).) The telephone companies are sometimes referred to as "small incumbent local exchange carriers or small ILECs." (*Calaveras Telephone Co. v. Public Utilities Com.* (2019) 39 Cal.App.5th 972, 976.)

3.

Vision, Inc.  The ISP affiliates do not participate in the CHCF-A program and the Commission does not regulate the rates they charge for Internet services.

The Commission is the respondent in this proceeding.  The only real party in interest that answered the petition is The Utility Reform Network (TURN).

*Universal Service Goal*

A fundamental principle of our nation's telecommunications policy is ensuring the availability of high quality, affordable telephone service for all Americans.  (Sen. Energy, Utilities and Communications Com., Analysis of Sen. Bill No. 379 (2011-2012 Reg. Sess.) as amended Aug. 20, 2012, p. 1 (Senate Utilities Analysis).)  Achieving this goal in rural, remote and sparsely populated areas is difficult because building and maintaining the necessary infrastructure is expensive and economies of scale are limited.  (*Blanca Telephone Company v. Federal Communications Commission* (10th Cir. 2021) 991 F.3d 1097, 1104–1105 (*Blanca*).)  As a result, it is more expensive on a per customer basis to serve such areas.  (*Ibid*.)  To address these difficulties, federal and state subsidy programs have been developed to defray some of the cost of providing service.

*Federal Program*

In 1934, Congress adopted the Communications Act of 1934 (47 U.S.C. § 151 et seq.) and created the Federal Communications Commission (FCC).  The FCC's purpose was to regulate interstate and foreign commerce in communication by wire and radio and make available, insofar as possible, communication services with adequate facilities at reasonable charges.  (47 U.S.C. § 151.)

In 1996, Congress updated that legislation by passing the Telecommunications Act (Pub. L. No. 104-104 (Feb. 8, 1996) 110 Stat. 56).  The new act explicitly stated the policy that "[c]onsumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services ... reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for

4.

similar services in urban areas." (47 U.S.C. § 254, subd. (b)(3); see *Blanca*, *supra*, 991 F.3d at p. 1105.) Congress directed the FCC to make policies "for the preservation and advancement of universal service" and provided principles to guide that policy making. (47 U.S.C. § 254, subd. (b).)

Pursuant to Congress's directive, the FCC established a Universal Service Fund (USF), from which subsidies were disbursed for services provided and infrastructure built in rural, high-cost areas. (*Tri-County Telephone Association, Inc. v. Federal Communications Commission* (D.C. Cir. 2021) 999 F.3d 714, 717; see 47 C.F.R. Part 54 [universal service].) The rules for distributing the funds were established by the FCC. (47 U.S.C. § 254, subd. (k).) The USF and its successor are financed by mandatory contributions from telecommunications carriers. (47 U.S.C. § 254, subd. (d); 47 C.F.R. § 54.706 [contributions from entities that provide interstate telecommunications to the public].)

Another aspect of the 1996 Telecommunications Act is its distinction between *telecommunication services*, which are subject to Title II of the act, and *information services*, which are addressed in Title I of the act. (*Mozilla Corporation v. Federal Communications Comm.* (D.C. Cir. 2019) 940 F.3d 1, 17 (*Mozilla*).) Telecommunication services are given common carriage status, which subjects them to an array of statutory restrictions and requirements. (*Ibid*.) In contrast, information services are exempted from common carriage status and regulation. (*Ibid*.) In 2018, after a change of administrations, the FCC changed the classification of broadband Internet access service to an "information service" and, thus, exempted such service from utility-style regulation under Title II of the1996 Telecommunications Act. (*Mozilla*, *supra*, at p. 17.) This change in classification was upheld by District of Columbia Circuit in *Mozilla*. The court stated that the FCC "permissibly classified broadband Internet access as an 'information service' by virtue of the functionalities afforded by [domain name service] and caching."

(*Mozilla*, *supra*, at p. 35.)  This classification is relevant to the telephone companies'
contention that broadband imputation is preempted by federal law.  (See pt. IV., *post*.)

*California Program*

The California subsidy program relevant to this case is the CHCF-A.  (See
*Calaveras Telephone Co. v. Public Utilities Com.*, *supra*, 39 Cal.App.5th at p. 976
["CHCF-A is one of the state's universal service programs"].)  The CHCF-A program
was first established in 1987.  At that time, federal and state laws and regulations
promoted universal service by supporting access to landline voice telephone service.
(Stats. 2011, ch. 695, § 1, subd. (a).)

As enacted in 2008, section 275.6 directed the Commission to "develop,
implement, and maintain a suitable program to establish a fair and equitable local rate
structure aided by universal service rate support to small independent telephone
corporations that serve rural areas and are subject to rate-of-return regulation by the
commission.  The purpose of the program shall be to promote the goals of universal
telephone service and to reduce any disparity in the rates charged by those companies."
(Stats. 2008, ch. 342, § 2.)  The 2008 version of the statute had a sunset date of January 1,
2013.  (Stats. 2008, ch. 342, § 2; former § 275.6, subd. (d).)  In 2011, the Legislature
extended the sunset date to January 1, 2015.  (Stats. 2011, ch. 695, § 3 [former § 275.6,
subd. (d)].)  Its current sunset date is January 1, 2028.  (§ 275.6, subd. (g).)

In late 2011, the FCC issued a major decision expanding the concept of universal
service to include broadband (not just voice service) and revamping the USF into the
Connection America Fund (CAF) to grant subsidies for facilities providing broadband
and voice service.  (Senate Utilities Analysis, *supra*, p. 2 [*Federal Program Now
Supports Broadband Service*].)  Under the CAF, carriers were eligible for funding only if
they met "broadband buildout requirements and demonstrate[d] that their networks
provide[d] minimum broadband speeds of 4 megabits per section (MBPS) downstream
and 1 MBPS upstream."  (*Ibid*.)  It was estimated that, if the FCC's new network upgrade

requirements were not met, California carriers could lose $25 million in federal funding annually. (*Ibid*.)

The FCC's shift to support broadband and the possibility that federal subsidies would be reduced and, as a result, the subsidies from the CHCF-A would be increased caused the Commission to issue *Order Instituting Rulemaking Regarding California High Cost Fund-A Program* (Nov. 18, 2011) Rulemaking 11-11-007, to begin a detailed review of the CHCF-A to develop a more efficient, prudent and forward-looking plan that reflected the realities of the market place and technological advancements. (Senate Utilities Analysis, *supra*, p. 2 [*CPUC Proceedings*].)

In 2012, while the rulemaking proceeding was pending before the Commission, the Legislature amended section 275.6. (Stats. 2012, ch. 729, §§ 1–3, pp. 5989–5991.) Whether the amended section 275.6 granted the Commission the authority to adopt broadband imputation is a question of statutory interpretation addressed in part II. of this opinion.

*Commission Decisions*

In December 2014, the Commission concluded phase I of the rulemaking proceeding and issued *Decision Adopting Rules and Regulations in Phase 1 of the Rulemaking for the California High Cost Fund-A Program* (Dec. 18, 2014) Decision No. 14-12-084. The Commission determined that it had the authority to order broadband imputation but that it was premature to adopt broadband imputation at that time. Accordingly, the Commission deferred its decision on whether to impose broadband imputation to phase II of the rulemaking proceeding, when certain studies relevant to the issue would be completed.

In January 2018, the FCC advanced a policy of deregulating the provision of broadband Internet access service by releasing In the Matter of Restoring Internet Freedom (2018) 33 F.C.C. Rcd. 311 [2018 WL 305638] (Restoring Internet Freedom Order). That decision changed the classification of broadband Internet access service

7.

from a "telecommunication service" to an "information service" and, thus, exempted such service from utility-style regulation under Title II of the 1996 Telecommunications Act. Paragraphs 194 through 204 of the decision set forth the FCC's conclusions about the preemption of inconsistent state and local regulations addressing broadband Internet access service. (Restoring Internet Freedom Order, *supra*, 33 F.C.C. Rcd. at pp. 426–432 [2018 WL 305638, at pp. 70–73*].)

In September 2018, a California study on broadband Internet and wireline voice competition was released. In March 2019, the Commission issued a scoping memo that invited the parties to comment on various issues, including (1) whether the Commission should impute broadband revenues towards the telephone companies' intrastate revenue requirement and (2) what impact the FCC's reclassification of broadband as an information service had on the Commission's authority to impose broadband imputation. Evidentiary hearings on these and other issues were held from January 27, 2020, through February 5, 2020.

In April 2021, the Commission issued *Decision Adopting Broadband Imputation in the General Rate Cases of the Small Independent Local Exchange Carriers* (Apr. 15, 2021) Decision No. 21-04-005. The decision ordered that, in the general rate cases of each telephone company, "[a]ll reasonable positive retail broadband-related revenues of the [telephone company] and its [ISP] affiliate (if such affiliate exists) (but excluding revenues derived from areas outside of the [telephone company's] telephone service territory and revenues resulting from alternative service platforms that are not based upon the [telephone company's] local exchange facilities) net of all reasonable broadband-related expenses of the [telephone company] and its ISP affiliate (if such affiliate exists) for the calendar year immediately preceding the filing of the [general rate case] application shall be imputed in the determination of rate design and [CHCF-A subsidy]." The decision also ordered telephone companies to submit financial information about broadband revenues and expenses with their general rate case applications. The decision

8.

described the effect of broadband imputation by stating that "each dollar increase in the broadband imputation amount will result in a corresponding dollar decrease in CHCF-A support."

*Rehearing Decision*

The telephone companies filed an application for rehearing of Decision No. 21-04-005. They asserted the decision was unlawful because it (1) violated sections 275.6 and 1757.1; (2) exceeded the Commissions jurisdictional authority; (3) impermissibly departed from Commission precedent and was the equivalent of retroactive ratemaking; (4) was preempted by federal law; and (5) constituted an unconstitutional taking of private property. TURN filed a response to the rehearing application, recommending that it be denied in its entirety.

In August 2021, the Commission issued *Order Denying Rehearing of Decision 21-04-005* (Aug. 19, 2021) Decision No. 21-08-042, which stated no legal error had been shown. Consequently, the Commission's broadband imputation order remained in effect.

*Writ Petition*

In September 2021, the telephone companies initiated this original proceeding by filing a petition for writ review of Decision No. 21-04-005 and Decision No. 21-08-042. The petition asked this court to annul both decisions.

In November 2021, the Commission and TURN each filed an answer to the petition for writ review. In January 2022, this court issued an order stating it would review the Commission's decisions pursuant to section 1756.

**DISCUSSION**

I.    BASIC LEGAL PRINCIPLES

    A.    The Commission's Authority

The Commission is a state agency of constitutional origin with far-reaching powers, duties, and functions. (*San Diego Gas & Electric Co. v. Superior Court* (1996)

9.

13 Cal.4th 893, 914 (*San Diego Gas*).) The California Constitution grants the Commission broad authority to regulate utilities, which includes fixing rates, establishing rules, holding various types of hearings, awarding reparation, and adopting its own procedures. (*Id*. at p. 915; see Cal. Const., art. XII, §§ 2, 4, 6.) It is significant to this writ proceeding that the Commission's powers are not limited to those expressly set forth in the Constitution. "The Legislature has plenary power, unlimited by the other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the commission .…" (Cal. Const., art. XII, § 5.)

The Legislature exercised this plenary power by enacting the Public Utilities Act (§ 201 et seq.), which vests the Commission with broad authority. (*San Diego Gas*, *supra*, 13 Cal.4th at p. 915.) Under section 701, "[t]he commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction." Based on the statutory phrases "do all things," "in addition thereto," and "necessary and convenient" (§ 701), our Supreme Court has stated that the Commission's administrative, legislative and judicial powers are to be liberally construed. (*San Diego Gas*, *supra*, at p. 915.)

One limit placed on the principle of liberal construction provides that "[a]dditional powers and jurisdiction that the commission exercises, however, 'must be cognate and germane to the regulation of public utilities.' " (*Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 905–906.) Another limit is that section 701 does not authorize the Commission to disregard express legislative directions or restrictions upon its powers found in other statutes. (*Assembly v. Public Utilities Com.* (1995) 12 Cal.4th 87, 103.)

10.

In accordance with these principles, our analysis of the arguments that the Commission exceeded its jurisdiction[3] will begin with whether the Commission acted within the scope of the authority granted by the Legislature. If the Commission acted within the scope of its statutory authority, we then will address whether the Legislature's grant of authority violated the limitations imposed by the California Constitution. After the state law issues have been resolved, we will analyze the federal issues of preemption and an unconstitutional taking.

B.      Judicial Review

The administrative actions underlying this original proceeding resulted in a Commission decision after a hearing (Dec. No. 21-04-005) and its subsequent decision after a rehearing (Dec. No. 21-08-042). Hearings are conducted by the Commission pursuant to sections 1701 through 1711. Rehearings are conducted in accordance with sections 1731 through 1736.

Any aggrieved party may obtain judicial review of the lawfulness of an original decision by the Commission and its subsequent decision on rehearing by filing a petition for writ of review in the Court of Appeal or the Supreme Court. (§ 1756, subd. (a).) A writ petition is the only means for obtaining judicial review of the Commission's decisions. (*Pacific Bell Wireless, LLC v. Public Utilities Com.* (2006) 140 Cal.App.4th 718, 728.) As a result, appellate courts should address the merits of a writ petition when the writ (1) complies with applicable procedures and (2) might have merit. (*Id.* at pp. 728–729.)

---

[3]     The word "jurisdiction" means "[a] government's general power to exercise authority over all persons and things within its territory." (Black's Law Dict. (11th ed. 2019) p. 1017.) The term "agency jurisdiction" is defined as "[t]he regulatory or adjudicative power of a government administrative agency over a subject matter or matters." (*Ibid.*) These basic definitions are provided because many of the telephone companies' arguments refer to jurisdiction. (See § 1757, subd. (a)(1) [reviewing court may consider whether Commission acted "in excess of[] its powers or jurisdiction"].)

11.

Applicable procedures require an aggrieved party seeking judicial review to have filed an application for rehearing with the Commission that raises each issue the party intends to pursue in court. (§§ 1732, 1756, subd. (a).) Stated another way, the party must exhaust its administrative remedies as to each ground that renders the decision unlawful. (*San Pablo Bay Pipeline Co. LLC v. Public Utilities Com.* (2013) 221 Cal.App.4th 1436, 1443 [exhaustion of administrative remedies].) The practical impact of the rehearing requirement is that matters presented to appellate courts will involve the Commission's original decision *and* its subsequent decision on the application for rehearing. Appellate courts must not address issues omitted from the application for rehearing.

Furthermore, the issues that may be presented for judicial review are limited to whether the Commission (1) acted without, or in excess of, its powers or jurisdiction; (2) proceeded in the manner required by law; (3) issued a decision not supported by the findings; (4) made findings not supported by substantial evidence in light of the whole record; (5) abused its discretion; or (6) violated a constitutional right. (§ 1757, subd. (a).)

C.      Standards of Review

The parties do not completely agree on the applicable standards of review. Accordingly, we address the standards applied to constitutional issues, factual findings, and determinations of questions of law—particularly, statutory interpretations.

Where a Commission decision is challenged on the ground it violates a constitutional right, the reviewing court must exercise independent judgment on the law and facts, and the Commission's findings or conclusions material to the constitutional question are not final. (§ 1760.) However, "we may not substitute our own judgment 'as to the weight to be accorded evidence before the Commission or the purely factual findings made by it.' " (*SFPP, L.P. v. Public Utilities Com.* (2013) 217 Cal.App.4th 784, 794.)

12.

When no constitutional issue is raised, the Commission's decision is treated like a superior court judgment—that is, it is presumed correct and the aggrieved party has the burden of demonstrating prejudicial error. (*BullsEye Telecom, Inc. v. Public Utilities Com.* (2021) 66 Cal.App.5th 301, 309 (*BullsEye*); see generally, *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [presumption that a superior court's judgment is correct and appellant's burden to demonstrate reversible error].) In such cases, the Commission's findings based on conflicting evidence, or undisputed evidence from which conflicting inferences reasonably may be drawn, are final and not subject to review. (*City and County of San Francisco v. Public Utilities Com.* (1985) 39 Cal.3d 523, 530–531.) "The only exception is those findings or conclusions 'drawn from undisputed evidence ... from which conflicting inferences may not reasonably be drawn [and therefore] present questions of law.' " (*Pacific Gas & Electric Co. v. Public Utilities Com.* (2015) 237 Cal.App.4th 812, 839.)

Questions of statutory interpretation are, of course, questions of law subject to our independent review. (*BullsEye*, *supra*, 66 Cal.App.5th at p. 309.) However, as a general rule, courts give deference to the Commission's interpretation of the Public Utilities Code and will not disturb that interpretation if it bears a reasonable relation to statutory purpose and language. (*Ibid.*) This deference is based on the Commission expertise and familiarity with the legal and regulatory issues related to that interpretation. (*Ibid.*) The general rule of deference does not apply when the issue is the scope of the Commission's powers and jurisdiction. (*Ibid.*)

II.    INTERPRETATION OF SECTION 275.6

A.    Contentions of the Parties

A fundamental dispute between the parties is whether section 275.6 authorizes broadband imputation. The telephone companies contend the plain language of section 275.6 is straightforward and does not authorize broadband imputation. They also contend

the legislative history supports this interpretation and contradicts the Commission's and TURN's reading of the statute.

In contrast, the Commission argues that interpreting section 275.6 to allow broadband imputation is consistent with the legislative intent and language of the statute, reads the statute as a whole, and harmonizes its provisions. Similarly, TURN argues the statutory language that addresses ratemaking concepts (which includes rate design and the revenue requirement) is sufficiently broad to allow the Commission to consider ISP affiliate net income when administering the rate-of-return framework and determining a telephone company's subsidy.

B.     Legislative History

Most of the statutory text addressed by the parties' arguments became a part of section 275.6 when the Legislature passed Senate Bill No. 379 (2011-2012 Reg. Sess.) (Senate Bill 379) in 2012. To establish the context for the statutory text, we consider Senate Bill 379's legislative history to identify the bill's goals and how it was revised prior to enactment to balance various interests and concerns.

1.     *June 12, 2012 Version of Senate Bill 379*

In March 2010, the FCC proposed expanding the concept of universal service in high-cost areas from providing just voice telephone service to include broadband services. (Assem. Com. on Utilities & Commerce, Rep. on Sen. Bill No. 379 (2011-2012 Reg. Sess.) as amended June 12, 2012, p. 2 [FCC activities and orders] (Assembly Utilities Analysis).) In November 2011, the FCC adopted this proposal and directed the $4.5 billion in the USF into the new CAF to subsidize providers in high-cost areas that accepted obligations to build out high-speed broadband networks. (*Ibid.*) The FCC's decision to require companies seeking subsidies to be capable of providing broadband service created the possibility that California's small rural telephone companies would

lose annually approximately $25 million in federal subsidies if they did not upgrade their networks to meet the federal requirements. (*Id*. at pp. 2–3.)[4]

The author of Senate Bill 379 asserted that the bill " 'will help preserve federal funding coming into California and enhance the availability of advanced broadband services in rural areas of the state.' " (Assembly Utilities Analysis, *supra*, p. 1.) To achieve these objectives, Senate Bill 379 would "codify the PUC's current practice of administering the CHCF-A program, while adding an explicit requirement for the PUC to promote <u>reasonable</u> access to advanced services and broadband-capable facilities." (Assembly Utilities Analysis, *supra*, p. 3.) In supporting Senate Bill 379, the telephone companies argued these statutory changes were needed because "the PUC may not allow cost support from the CHCF-A program for network improvements because they benefit the provision of broadband service, even though the improvement benefit the provision of telephone service as well." (*Id*. at p. 2.) They also argued that the cost of the CHCF-A would increase significantly if the federal subsidies were lost because the CHCF-A would need to cover the loss in funding. (*Id*. at pp. 3–4.) The Commission's staff argued Senate Bill 379 and less federal funding could double the subsidies requested from the CHCF-A, which would significantly increase the surcharge on intrastate telecommunication billings added to each ratepayers monthly bill. (*Id*. at p. 3.) Thus, the fundamental question Senate Bill 379 presented to the Legislature was whether California should follow the FCC's example and modify the CHCF-A to explicitly allow it to subsidize investments in broadband capable infrastructure. (*Id*. at p. 2)

The analysis prepared for the Assembly Committee on Utilities and Commerce discussed the arguments about cost and included the following:

---

[4]     Such an upgrade would include replacing copper facilities with fiber optic facilities capable of providing broadband service. (*Assembly Utilities Analysis*, *supra*, p. 4.)

"The compromise:  However to address the cost concerns raised by stakeholders, the author has agreed to add subparagraph (c) [of section 276.5], which directs the PUC's administration of the CHCF-A program, the following requirement:  (7) Ensure that support is not excessive so that the burden on all contributors to the CHCF-A program is limited."  (Assembly Utilities Analysis, *supra*, p. 4.)

Supporters of Senate Bill 379 included the California Independent Telecommunications Companies (CITC), which sponsored the bill, and the California State Association of Counties, the Regional Council of Rural Counties, and the California Association of Competitive Telecommunications Companies (which had withdrawn its opposition to a prior version after a particular provision was removed).  (Assembly Utilities Analysis, *supra*, p. 4.)  TURN stated it supported carrier efforts to deploy broadband-capable facilities but opposed a mandate to provide subsidy money to promote broadband capable facilities through an all end user surcharge.  (*Ibid.*)

### 2.    *June 25, 2012 Version of Senate Bill 379*

An analysis of Senate Bill 379 prepared for the Assembly Committee on Appropriations discussed concerns raised by the telephone companies and the Commission.  (Assem. Com. on Appropriations, Rep. on Sen. Bill No. 379 (2011-2012 Reg. Sess.) as amended June 25, 2012, p. 2 (Assembly Appropriations Analysis).)  The telephone companies argued the legislative update was needed because "the PUC may not allow cost support from the CHCF-A program for network improvements because [the companies] benefit from the provision of broadband service, even though the improvements benefit the provision of telephone service as well."  (*Ibid.*)  An analysis by Commission staff raised the concern that is at the root of this litigation:  " 'SB 379 would require ratepayers to subsidize the rate-of-return carriers' deployment of broadband-capable facilities even though California has limited jurisdiction over broadband services and cannot take into account revenues from these unregulated services when determining local rates for the rate of return carriers.' "  (*Ibid.*)

16.

The analysis also referred to the concern about a reduction in federal subsidies to California's small telephone companies: "Hypothetically, if these companies lost the $25 million in federal funding because they could not meet the FCC's broadband speed, capacity, and other reliability requirements, the CHCF-A program could increase significantly." (Assembly Appropriations Analysis, *supra*, at p. 1.)

3.      *August 20, 2012 Version of Senate Bill 379*

An analysis of Senate Bill 379 prepared for the Senate Energy, Utilities and Communications Committee also discussed the concerns at the root of this litigation:

> "Improper Subsidy of Broadband? The []PUC, TURN, and DRA oppose this bill, claiming that the issues it addresses are under consideration in the []PUC rulemaking on the CHCF-A. They also claim that the bill could as much as double the size of the [CHCF-]A Fund, thereby impacting all customers, although the bill's sponsor disputes this claim. In addition, they object to providing ratepayer-funded subsidies for broadband facilities without giving the []PUC authority to consider the revenue a rural company earns from unregulated services delivered with the same broadband facilities that the CHCF-A would subsidize.
>
> "Recent amendments seek to address these concerns. An Assembly Utilities and Commerce Committee amendment requires the []PUC to ensure that support to companies is 'not excessive' so that customer impact is limited. An Assembly Appropriations Committee amendment requires companies to provide the []PUC information about revenues from unregulated broadband revenues, which they could otherwise assert they are not required to provide given FCC jurisdiction over these services." (Senate Utilities Analysis*, supra,* p. 3.)

The analysis also addressed how the bill's provisions would be implemented, noting Senate Bill 379 requires the PUC to determine the amount of a company's subsidy as part of a general rate case and, as a result, the Senate Bill 379's provisions would not be triggered until a general rate case is filed. (Senate Utilities Analysis, *supra*, p. 3.) The analysis also stated (1) the Commission was considering staying new general rate cases until it completed the rulemaking proceeding on the CHCF-A and (2) "even after a [general rate case] is filed, the bill preserves the []PUC's discretion to determine, based

17.

on the facts in each case, what is a 'reasonable investment' necessary for providing voice and broadband service.  This question will presumably be debated by all parties in the [general rate case.]" (*Ibid.*)

The Legislature passed Senate Bill 379 and, on September 28, 2012, the Governor approved it and the Secretary of State filed it.  (Stats. 2012, ch. 729.)  The Legislature expressly declared its intent to preserve (1) federal universal service funding for telephone companies participating in the CHCF-A, which would reduce cost pressures on the program and minimize the surcharges needed to fund the CHCF-A; (2) application of the FCC's cost allocation and separation rules to the expenses and investments of telephone companies participating in the CHCF-A program; and (3) the PUC's discretion in open Rulemaking 11-11-07 to establish the regulatory requirements for the CHCF-A program within the policy framework provided by the act.  (Stats. 2012, ch. 729, § 1, p. 5990.)

C.      Statutory Text

Section 275.6 does not explicitly authorize or prohibit the imputation of an affiliate's broadband income to the telephone company when determining its rates and its subsidy amount.  Consequently, the question of statutory interpretation presented is whether the general grants of authority in section 275.6 encompass the specific authority to impute an affiliate's broadband income.  Under the rules of statutory construction, the analysis of the statute's meaning begins with the words of the statute itself and gives those words their usual and ordinary meaning.  (*Cavey v. Tualla* (2021) 69 Cal.App.5th 310, 336.)  Accordingly, we start by examining the text of the provisions granting authority to the Commission.

Subdivision (a) of section 275.6 sets forth the Commission's responsibilities in maintaining the CHCF-A program in broad terms:

> "The commission shall exercise its regulatory authority to maintain the [CHCF-A program] to provide universal service rate support to small

independent telephone corporations in amounts sufficient to meet the revenue requirements established by the commission through rate-of-return regulation in furtherance of the state's universal service commitment to the continued affordability and widespread availability of safe, reliable, high-quality communications services in rural areas of the state."

Subdivision (b) of section 275.6 defines certain terms, including rate design, rate-of-return regulation, and revenue requirement. " 'Rate-of-return regulation' means a regulatory structure whereby the commission establishes a telephone corporation's *revenue requirement*, and then fashions a *rate design* to provide the company a fair opportunity to meet the *revenue requirement*." (§ 275.6, subd. (b)(4), italics added.) " 'Revenue requirement' means the amount that is necessary for a telephone corporation to recover its reasonable expenses and tax liabilities and earn a reasonable rate of return on its *rate base*." (§ 275.6, subd. (b)(5), italics added.) " 'Rate base' means the value of a telephone corporation's plant and equipment that is reasonably necessary to provide regulated voice services and access to advanced services, and upon which the telephone corporation is entitled to a fair opportunity to earn a reasonable rate of return." (§ 275.6, subd. (b)(2).) " 'Rate design' means the mix of end user rates, high-cost support, and *other revenue sources* that are targeted to provide a fair opportunity to meet the *revenue requirement* of the telephone corporation." (§ 275.6, subd. (b)(3), italics added.)[5]

Subdivision (c) of section 275.6 sets forth the Commission's responsibilities by identifying things the Commission "shall do"[6] in administering the CHCF-A program:

> "(1) Continue to set rates to be charged by the small independent telephone corporations in accordance with Sections 451, 454, 455, and 728.

> "(2) Employ rate-of-return regulation to determine a small independent telephone corporation's revenue requirement in a manner that provides revenues and earnings sufficient to allow the telephone corporation to

---

[5]    The italicized terms, except "other revenue sources," are defined by section 275.6, subdivision (b).  The term "other revenue sources" is italicized because the Commission and TURN contend encompasses an affiliate's broadband revenue.

[6]    " 'Shall' is mandatory."  (§ 15.)

deliver safe, reliable, high-quality voice communication service and fulfill its obligations as a carrier of last resort in its service territory, and to afford the telephone corporation a fair opportunity to earn a reasonable return on its investments, attract capital for investment on reasonable terms, and ensure the financial integrity of the telephone corporation.

"(3) Ensure that rates charged to customers of small independent telephone corporations are just and reasonable and are reasonably comparable to rates charged to customers of urban telephone corporations.

"(4) Provide universal service rate support from the CHCF-A Program to small independent telephone corporations in an amount sufficient to supply the portion of the revenue requirement that cannot reasonably be provided by the customers of each small independent telephone corporation after receipt of federal universal service rate support.

"(5) Promote customer access to advanced services and deployment of broadband-capable facilities in rural areas that is reasonably comparable to that in urban areas, consistent with national communications policy.

"(6) Include all reasonable investments necessary to provide for the delivery of high-quality voice communication services and the deployment of broadband-capable facilities in the rate base of small independent telephone corporations.

"(7) *Ensure that support is not excessive so that the burden on all contributors to the CHCF-A program is limited.*"  (§ 275.6, subd. (c), italics added.)

The foregoing directives are general in nature, which is consistent with Legislature explicit declaration of its intent to preserve the Commission's discretion "in open Rulemaking 11-11-007 to establish the regulatory requirements for the [CHCF-A] Program within the policy framework provided by this act."  (Stats. 2012, ch. 729, § 1, subd. (c), p. 5990.)

Subdivision (e) of section 275.6—the only provision in section 275.6 that uses the word "affiliate"—states:

"Upon request from the commission, a small independent telephone corporation that receives support from the CHCF-A program *shall* provide information regarding *revenues derived from the provision of unregulated internet access service* by that corporation or its *affiliate* within that

20.

corporation's telephone service territory. The commission shall treat as confidential any information provided pursuant to this subdivision." (Italics added.)

### 1. The Text is Ambiguous

The threshold legal question is whether the foregoing statutory language is ambiguous—that is, reasonably susceptible to more than one interpretation (*Cavey v. Tualla*, *supra*, 69 Cal.App.5th at p. 336)—on the issue of whether the general grants of authority in section 275.6 encompass the specific authority to impute an affiliate's broadband income when determining a telephone company's rates and subsidy. Because section 275.6 does not explicitly authorize or prohibit broadband imputation and the parties have drawn conflicting, reasonable inferences from its wording, we conclude the statute is ambiguous on that particular issue.

### 2. Resolving the Ambiguity

We also conclude the issue of statutory interpretation considered here involves the scope of the Commission's jurisdiction—that is, its power or authority—and, therefore, the general rule of deference to its statutory interpretation does not apply. (See *BullsEye*, *supra*, 66 Cal.App.5th at p. 309.) Consequently, we apply the usual rules for construing an ambiguous statute. Under those rules, a court's primary goal is to adopt the interpretation that best effectuates the legislative intent or purpose. (*Cavey v. Tualla*, *supra*, 69 Cal.App.5th at p. 337; see *Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190 [interpretation of a statute presents a question of law subject to de novo review on appeal].) To identify a statute's purpose and the underlying legislative intent, courts may consider a variety of extrinsic aids, including the legislative history. (*Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1250, 1251–1252.)

Here, the legislative history shows that the Legislature was aware of the Commission's concerns about subsidizing broadband facilities that could be used to generate revenue from unregulated services and its lack of authority to consider those revenues in determining the amount of a CHCF-A subsidy. (Senate Utilities Analysis,

21.

*supra*, at p. 3.)  The legislative history also shows that Senate Bill 379 was amended to address this concern and the provisions added were subdivisions (c)(7) and (e) of section 275.6.  (Senate Utilities Analysis, *supra*, at p. 3.)  Subdivision (c)(7) of section 275.6 directs the Commission to ensure that CHCF-A subsidies are "not excessive." Subdivision (e) of section 275.6 requires telephone companies, upon request from the Commission, to "provide information regarding revenues derived from the provision of unregulated internet access service by that corporation or its affiliate within that corporation's telephone service territory."

Based on the legislative history and statutory text, we conclude the Legislature gave the Commission the authority to address the issue of whether subsidizing infrastructure that is used to generate both regulated and unregulated revenue could generate subsidies that were too large—that is, "excessive."  (§ 275.6, subd. (c)(7).) Furthermore, the Legislature did not specify a particular formula, model, or method for determining whether a subsidy was excessive, but committed those details to the Commission's discretion.  (Stats. 2012, ch. 729, § 1, subd. (c), p. 5990.)  The fact the Legislature gave the Commission the authority to obtain "information regarding revenues derived from the provision of unregulated Internet access service by that corporation or its affiliate within that corporation's telephone service territory" creates a strong inference that the Commission would be able to use that information in determining whether a subsidy was excessive.

In addition, the rate design adopted by the Commission for a telephone company must consider rates, subsidies and "other revenue sources" and give the telephone company a fair opportunity to meet its revenue requirement.  (§ 275.6, subd. (b)(3).)  The term "other revenue sources" is sufficiently broad to include the broadband revenues imputed from an ISP affiliate.

Accordingly, we interpret the general authority granted to the Commission by section 275.6 to include the specific authority to impute broadband revenues of an

affiliate in determining a telephone company's rate design and its subsidy from the CHCF-A. Whether this interpretation violates other statutory provisions or the California Constitution is addressed next.

## III. SCOPE OF COMMISSION'S JURISDICTION

The telephone companies contend that broadband imputation exceeds the Commission's jurisdiction under state law, which is restricted to public utilities. In particular, they argue their affiliates are not public utilities because Internet access is not a telephone service and the ISP affiliates do not own, control, operate, or manage telephone lines. They contend that broadband imputation is, in effect, a regulation of the ISP affiliates which are outside the Commission's public utility authority. The telephone companies support this argument with cites to subdivision (b) of section 314, which addresses the Commission's inspection authority relating to affiliates; the definitions in sections 216, subdivision (a)(1) (public utility), 233 (telephone line), and 234 (telephone corporation); and *City and County of San Francisco v. Western Air Lines, Inc.* (1962) 204 Cal.App.2d 105, which states: "Unless the enterprise or activity in question is a public utility as defined in the Constitution or Public Utilities Code, it is not subject to the jurisdiction of such commission." (*Id.* at p. 131.)

### A. Statutory Authority and Alleged Conflict

We first consider whether our interpretation of the authority granted to the Commission by section 275.6 (pt. II, *ante*) must be rejected because it contradicts other provisions of the Public Utilities Code that (1) define the Commission's powers or jurisdiction and (2) are controlling in the event of a conflict. In conducting this inquiry, we assume for purposes of this proceeding that the authority granted by section 275.6 irreconcilably conflicts with the statutes cited by the telephone companies. (See *State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 960 [rules applied "when faced with two irreconcilable statutes"].) In situations where conflicting statutes cannot

be reconciled, (1) the more specific provision takes precedence over the more general provisions and (2) later enactments supersede earlier ones. (*Id*. at pp. 960–961; Code Civ. Proc., § 1859 ["when a general and particular provision are inconsistent, the latter is paramount to the former"].)

First, we conclude section 275.6 is more specific than the provisions relied upon by the telephone companies. Section 275.6 governs a specific program, the CHCF-A. It does not govern utilities in general or all companies that provide telephone service. Furthermore, subdivisions (c)(7) and (e) were added to section 275.6 to address a specific issue that arises when determining the amount of a subsidy—namely, how to ensure subsidies were not excessive as a result of an affiliate providing broadband services using subsidized infrastructure of the telephone company. Thus, under established principles of statutory construction, we conclude the Legislatures' grant of authority to consider an affiliate's broadband revenues when determining the amount of a telephone company's subsidy takes precedence over other provisions of the Public Utilities Code. One way to conceptualize this conclusion is that the more specific provisions in section 275.6 operate as an exception to the more general statutory provisions. (See *State Dept. of Public Health v. Superior Court*, *supra*, 60 Cal.4th at p. 961.)

Second, the relevant provisions in section 275.6 were enacted in 2012 with the adoption of Senate Bill 379. (Stats. 2012, ch. 729, § 2, pp. 5990–5991.) The telephone companies have not shown that the statutory language upon which they rely was enacted more recently than Senate Bill 379. (See generally, *Directors Guild of America v. Harmony Pictures, Inc.* (C.D.Cal. 1998) 32 F.Supp.2d 1184 [effect given to later-enacted Cal. U. Comm. Code, § 3311 after court concluded it could not be reconciled with earlier-enacted Civ. Code, § 1526].) Therefore, the principle that the later-enacted provision supersedes earlier ones also supports our conclusion that the Commission's authority to impute an affiliate's broadband revenues supersedes the statutory provisions relied upon by the telephone companies.

24.

Based on the foregoing, we conclude the Commission did not act in excess of its *statutory* powers or jurisdiction for purposes of section 1757, subdivision (a)(1) when it concluded that "[a]ll reasonable net positive retail broadband-related revenues of the [telephone companies] and their ISP affiliates (but excluding revenues derived from areas outside of the[ir] telephone service territories and revenues resulting from alternative service platforms that are not based upon the[ir] local exchange facilities) should be imputed in the determination of rate design and CHCF-A [subsidy] in the [telephone companies' general rate cases]."

B.      Constitutional Analysis

We next consider whether our interpretation of the authority granted to the Commission by section 275.6 must be rejected because it violates provisions in the California Constitution. The telephone companies' writ petition cites section 19 of article I and sections 3 and 6 of article XII of the California Constitution.

Section 19 of article I of the California Constitution provides that private property may not be taken without just compensation. The unconstitutional taking argument is addressed in part V. of this opinion.

Section 3 of article XII of the California Constitution states in part:

"Private corporations and persons that own, operate, control, or manage a line, plant, or system for … the transmission of telephone and telegraph messages … directly or indirectly to or for the public, and common carriers, are *public utilities* subject to control by the Legislature. The Legislature may prescribe that additional classes of private corporations or other persons are public utilities." (Italics added.)

Section 6 of article XII of the California Constitution authorizes the Commission to "fix rates, establish rules, examine records, issue subpoenas, administer oaths, take testimony, punish for contempt, and prescribe a uniform system of accounts for all *public utilities subject to its jurisdiction*." (Italics added.)

25.

The telephone companies argue these sections in article XII authorize the Commission to regulate only public utilities and this limitation is violated by broadband imputation because imputation has the effect of subjecting unregulated ISP affiliates to public utility regulation. The telephone companies contend that "imputation is beyond the Commission's jurisdiction under state law, which is limited to public utilities."

This argument, insofar as it is based on the California Constitution, is not developed. The telephone companies have not referred to any principles of law that provide a test or standard for determining when a regulation is deemed to subject an entity that is not a public utility subject to a public utility regulation *for purposes of the California Constitution*. Consequently, they have not carried their burden of showing that the Commission erred in determining broadband imputation did not subject the IPS affiliates to a public utility regulation, which determination was based on the Commission's factual findings that imputation (1) does not apply a rate regulation to the prices charged by ISP affiliates and (2) does not impose any requirements or limitations on the services or operations of the affiliates.

Consequently, we conclude the telephone companies have not demonstrated broadband imputation violates provisions in article XII of the California Constitution by subjecting ISP affiliates to a public utility regulation.

IV.     FEDERAL PREEMPTION

A.     General Principles of Preemption

The laws of the United States "shall be the supreme Law of the Land," notwithstanding anything to the contrary in the constitution or laws of any state. (U.S. Const., art. VI, cl. 2.) Under the supremacy clause, Congress has the power to preempt state law. (*Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 372–374.)

Some decisions identify four species of federal preemption—namely, express, conflict, obstacle, and field. (*Viva! Internat. Voice for Animals v. Adidas Promotional*

26.

*Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935.) Express preemption, which is easy for courts to apply, occurs when Congress explicitly defines the extent to which its enactments preempt state law. (*Id*. at p. 936.) Conflict preemption occurs when it is impossible to simultaneously comply with both state and federal law. (*Ibid*.)[7] Obstacle preemption arises when, in a particular case, the challenged state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. (*Ibid*.) Field preemption is Congress's intent to preempt all state law in a particular area and occurs where the scheme of federal regulation is sufficiently comprehensive to reasonably infer that Congress left no room for supplementary state regulation. (*Ibid*.) The burden of proving preemption is on the party claiming it applies, and courts are reluctant to infer preemption. (*Ibid*.)

Other decisions categorize the types of preemption differently. They treat state laws that make it impossible for private parties to comply with both state and federal law and state laws that prevent or frustrate the accomplishment of a federal objective as types of conflicting state laws that are nullified by the supremacy clause. (*Geier v. American Honda Motor Co., Inc.* (2000) 529 U.S. 861, 873 (*Geier*).) In *Geier*, the United States Supreme Court concluded the plaintiff's state law negligence claim based on car's failure to have a driver's side airbag was preempted because such a tort claim conflicted with a federal standard requiring some, but not all, 1987 cars to have airbags. (*Geier*, *supra*, at p. 874.)

---

[7] This court has observed that "[f]ederal conflict preemption is difficult to establish because it requires showing that it is impossible to comply with the requirements of both federal and state law." (*Kirby v. County of Fresno* (2015) 242 Cal.App.4th 940, 962.)

B.     Federal Preemption of State Broadband Regulations[8]

In *Mozilla*, *supra*, 940 F.3d 1, the District of Columbia Circuit applied preemption doctrine to the FCC's conclusions about preemption set forth the Restoring Internet Freedom Order. The parties do not contend the court erred in its analysis. Therefore, we accept *Mozilla*'s analysis and conclusions about preemption.

In *Mozilla*, the District of Columbia Circuit initially addressed whether the FCC, as part of its deregulatory approach to the Internet, acted within its statutory authority when it reclassified broadband Internet access service to an "information service." (*Mozilla*, *supra*, 940 F.3d at pp. 18–35.) The court concluded the change in classification was permissible. (*Id*. at p. 35.)

After upholding the FCC's reclassification of broadband service, the District of Columbia Circuit addressed the validity of the FCC's preemption directive, which was set forth in paragraphs 194 through 204 of the Restoring Internet Freedom Order. (*Mozilla*, *supra*, 940 F.3d at pp. 74–86.) Paragraph 194 stated "that 'regulation of broadband Internet access service should be governed principally by a uniform set of federal regulations,' and not 'by a patchwork that includes separate state and local requirements.' " (*Id*. at p. 74.) To achieve this goal, paragraph 195 of the order stated it " 'preempt[s] any state or local measures that would effectively impose rules or

---

[8]     How federal preemption affects a state's authority over broadband services is a subject addressed in several scholarly articles. (E.g., Witteman, *Net Neutrality from the Ground Up* (2022) 55 Loy. L.A. L.Rev. 65, 68 [describing "net neutrality" as the principle of nondiscrimination in the delivery of Internet traffic]; Deacon, *Institutional Considerations for the Regulation of Internet Service Providers* (2022) 74 Fed. Comm. L.J. 111, 113–121 [history of how the FCC reached its current posture regarding ISPs]; Narechania & Stallman, *Internet Federalism* (2021) 34 Harv. J.L. & Tech. 547, 550 ["there is little agreement over the scope of federal, state, and local regulatory power over broadband carriage"]; Spiwak, *The Preemption Predicament over Broadband Internet Access Services* (2020) 21 Federalist Soc'y Rev. 32 ["complex issues of federalism routinely haunt the broadband debate"]; Lyons, *State Net Neutrality* (2019) 80 U. Pitt. L. Rev. 905.)

requirements that [the FCC has] repealed or decided to refrain from imposing in this order or that would impose more stringent requirements for any aspect of broadband service that we address in this order.' " (*Ibid*.) Thus, the order attempted to "invalidate[] all state and local laws that the [FCC] deems to 'interfere with federal regulatory objectives' or that involve 'any aspect of broadband service * * * address[ed]' in the Order." (*Ibid*.)

The District of Columbia Circuit concluded the preemption directive exceeded the FCC's express statutory authority and its ancillary authority. (*Mozilla*, *supra*, 940 F.3d at p. 75.) The court stated:

> "Not only is the [FCC] lacking in its own statutory authority to preempt, but its effort to kick the States out of intrastate broadband regulation also overlooks the Communications Act's vision of dual federal-state authority and cooperation in this area specifically." (*Mozilla*, *supra*, at pp. 80–81.)

Noting that the power to preempt state law must be conferred by Congress, the court rejected the FCC's contention that the federal policy of nonregulation of information services was a source of authority for its preemption directive. The court reasoned that an agency could not confer preemption authority on itself by adopting a policy. (*Mozilla*, *supra*, 940 F.3d at p. 78.)

The court also addressed the FCC's argument that it "should leave the Preemption Directive undisturbed because principles of conflict preemption would lead to the same result." (*Mozilla*, *supra*, 940 F.3d at pp. 81–86.) The court rejected this argument, stating:

> "Conflict preemption applies to 'state law that under the circumstances of the particular case stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress—whether that "obstacle" goes by the name of conflicting; contrary to; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; interference, or the like.' *Geier[, supra,]* 529 U.S. 861, 873 …. We have long recognized that 'whether a state regulation unavoidably conflicts with

29.

national interests is an issue incapable of resolution in the abstract,' let alone in gross." (*Mozilla*, *supra*, 940 F.3d at p. 81.)

Based on these principles, the court rejected the FCC's categorical determination that any form of state regulation of intrastate broadband would inevitably conflict with the Restoring Internet Freedom Order. (*Mozilla*, *supra*, 940 F.3d at p. 82.) The court concluded its discussion of preemption by stating:

> "At bottom, the [FCC] lacked the legal authority to categorically abolish all fifty States' statutorily conferred authority to regulate intrastate communications. For that reason, we vacate the Preemption Directive, [Restoring Internet Freedom Order] ¶¶ 194–204. And because no particular state law is at issue in this case and the [FCC] makes no provision-specific arguments, it would be wholly premature to pass on the preemptive effect, under conflict or other recognized preemption principles, of the remaining portions of the [Restoring Internet Freedom Order]." (*Mozilla*, *supra*, 940 F.3d at p. 86.)

Here, section 275.6 and the Commission's broadband imputation decision constitutes a specific state law that was absent in *Mozilla*. Consequently, stated in general terms, the preemption issue presented is whether, under the particular circumstances of this case, the broadband imputation authorized by section 275.6, " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*Geier*, *supra*, 529 U.S. at p. 873.) As described below, we conclude it does not.

C.     Contentions of the Parties

The telephone companies recognize that the FCC's Preemption Directive is not good law and do not ask this court to categorically nullify all state regulations that may touch upon Internet access services. Instead, the telephone companies challenge broadband imputation as an impermissible public utility type regulation and economic regulation that directly conflicts with the FCC's deregulatory approach to Internet access services.

In response, the Commission asserts that broadband imputation does not amount to a public utility style regulation or an economic regulation. In particular, the Commission argues that "broadband imputation neither regulates the services or operations of the ISP affiliates nor regulates their rates, leaving the ISP affiliates free to set retail broadband prices."

The telephone companies challenge the Commission's contention that broadband imputation leaves the ISP affiliates free from Commission regulation. They argue this contention "rests on the fiction that imputation has 'no impact on the rates, services, or operations of the ISP affiliates.' " The telephone companies assert broadband imputation will push more regulated cost responsibility to the unregulated operations of ISP affiliates and will apply cost pressure to the common owners. In addition, the telephone companies contend the requirement that they disclose detailed financial information and subject their operations to a regulatory audit will force them to incur unrecoverable costs caused by the disclosure and audit.[9]

D.     Analysis

In paragraph 195 of the Restoring Internet Freedom Order, the FCC stated "we thereby preempt any so-called 'economic' or 'public utility-type' regulations, ...."

---

**9**     In the Matter of National Association of Regulatory Utility Commissioners Petition for Clarification or Declaratory Ruling that No FCC Order or Rule Limits State Authority to Collect Broadband Data (2010) 25 F.C.C. Rcd. 5051, the FCC addressed whether it had exercised its delegated authority to preclude the States from undertaking mandatory broadband information collection efforts and conclude it had "not preempted or otherwise precluded the States from mandating that broadband providers file data or other information regarding broadband infrastructure or services with the States." (*Id.* at pp. 5053–5054 [paragraph 7]; see Lyons, *State Net Neutrality*, *supra*, 80 U. Pitt. L.Rev. at pp. 938–939; see generally, *New Cingular Wireless PCS LLC v. Picker* (N.D. Cal. 2016) 216 F.Supp.3d 1060, 1071, fn 9.) The telephone companies have ignored this FCC decision and have not demonstrated that the subsequent reclassification of Internet access service was an exercise of authority that preempted the collection of information about broadband revenues and expenses.

31.

(Restoring Internet Freedom Order, 33 F.C.C. Rcd. at pp. 427–428.) To explain the scope of this statement, the FCC included the following definitions:

> "The terms 'economic regulation' and 'public utility-type regulation,' as used here, are terms of art that the Commission has used to include, among other things, requirements that all rates and practices be just and reasonable; prohibitions on unjust or unreasonable discrimination; tariffing requirements; accounting requirements; entry and exit restrictions; interconnection obligations; and unbundling or network-access requirements." (33 F.C.C. Rcd at p. 428, fn. 730.)

For purposes of this original proceeding, we accept this explanation of what constitutes an economic regulation or public utility type regulation that would be preempted by federal law. Therefore, the preemption question presented is whether broadband imputation constitutes an economic or public utility type regulation *of the ISP affiliate*.

First, we agree with the Commission that broadband imputation does not *directly* impose economic or public utility type regulation on the ISP affiliates. It does not directly impose any requirement on their rates and practices, prohibit discrimination, impose tariffing requirements, impose accounting requirements, restrict entry or exist from the ISP business, impose interconnection obligation, or require unbundling or network access. Thus, the Commission correctly found that broadband imputation does not impose price controls on ISP affiliates and does not impose any additional regulations affecting their operations.

Second, we reject the telephone companies' argument that the *indirect* effects of broadband imputation result in an economic or public utility type regulation of the ISP affiliates. The fundamental difficulty in this case is that the infrastructure used to provide regulated telephone service also can be used to provide unregulated Internet access service and, as a result of broadband's dual capability, the identification of the infrastructure costs of providing the telephone service cannot be completely separated from the infrastructure cost of providing Internet access service. Stated another way, no

matter what regulatory scheme is adopted to determine the rates and subsidies for telephone service, that scheme, either explicitly or implicitly, must take a stance of what infrastructure costs are attributable to each type of service. If the Commission is completely barred from considering the cost and revenue associated with the unregulated Internet access service, the common owner, telephone company, and its ISP affiliate would be free to adopt whatever internal accounting they choose and thereby profit from the infrastructure subsidized by California's ratepayers. This approach, which forces the Commission to ignore the marketplace realities of broadband's dual capabilities, would effectively erode the Commission's authority to set reasonable rates and reasonable subsidies under the CHCF-A, thus curtailing its authority to effectively regulate the telephone companies and the provisions of telephone services. In addition, it would allow the ISP affiliate to generate profits without bearing its fair share of the cost of the infrastructure. As a result, we conclude that how the common owners and ISP affiliates actually or might react to broadband imputation (these reactions are some of the indirect effects of imputation) does not convert the Commission regulations of rates and subsidies for telephone services into the regulation of Internet access services for purposes of federal preemption analysis.

In other words, to the extent that the ISP affiliates experience the indirect effects from broadband imputation, those effects are not properly described as economic or public utility type regulations *of the ISP affiliates*. Rather, broadband imputation is appropriately characterized as a public utility type of regulation of the telephone companies. We recognize the foregoing application of general principles about conflict preemption to broadband imputation is not supported by cites to existing case law. The absence of supporting authority comes from the unique aspects of the broadband imputation adopted by the Commission and the fact that, before the FCC changed its policy in 2018, broadband services were classified as telecommunications services

33.

subject to regulation under Title II of the 1996 Telecommunications Act. As a result, the questions of law presented here have not been addressed previously.

## V. UNCONSTITUTIONAL TAKING CLAIM IS UNRIPE

The telephone companies contend broadband imputation constitutes an unconstitutional taking of private property. In Decision No. 21-08-042, the Commission rejected this claim, reiterating its earlier conclusion that the evidence failed to establish that broadband imputation would necessarily result in net losses for the telephone companies. In addition, the Commission determined the unconstitutional takings claims were premature. We agree that the taking claims are unripe.

Broadband imputation will affect the money received by the telephone companies in two basic ways. If income is imputed, it will lower their subsidy under the CHCF-A and it may lower the rates the Commission authorizes them to charge for intrastate telephone service.

### A. Lowering Subsidies Does Not Take Private Property

A subsidy is not private property and, therefore, the reduction of the subsidy does not constitute the taking of private property of the telephone companies or the ISP affiliates. (U.S. Const., 5th Amend. ["nor shall private property be taken for public use, without just compensation"]; Cal. Const., art. I, § 19 [private property may be taken only when just compensation has first been paid to the owner].) Consequently, to establish a constitutional taking, the telephone companies must show the impact to their rates will be confiscatory.

### B. Ratemaking

#### 1. Basic Principles

In *Ponderosa Telephone Co. v. Public Utilities Com.* (2019) 36 Cal.App.5th 999 (*Ponderosa*), this court considered an argument by three of the telephone companies that a Commission decision set their cost of capital—a component used in ratemaking—

unreasonably low, resulting in a rate of return that was confiscatory (i.e., an unconstitutional taking). (*Id*. at p. 1003.) We concluded the telephone companies failed to demonstrate that the Commission cost of capital decision fell short of constitutional standards requiring public utilities be allowed a reasonable rate of return. (*Ibid*.)

In *Ponderosa*, we summarized some of the principles and standards applied to determine whether the rates set for a public utility result in an unconstitutional taking. (*Ponderosa*, *supra*, 36 Cal.App.5th at pp. 1014–1016.) Broadly stated, " 'the Constitution protects utilities from being limited to a charge for their property serving the public which is so "unjust" as to be confiscatory.' " (*Ponderosa*, at p. 1015, quoting *Duquesne Light Co. v. Barasch* (1989) 488 U.S. 299, 307.) A reasonableness standard is applied. " 'Rates which are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the service are unjust, unreasonable and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment.' " (*Ponderosa*, at p. 1014–1015, quoting *Bluefield Co. v. Pub. Serv. Comm.* (1923) 262 U.S. 679, 690.)

### 2. Ripeness

"One challenging a rate-fixing order on constitutional grounds of confiscation is charged with the burden of showing that the evidence does not support the commission's findings and that *the rate as finally fixed is unreasonable* and will result in confiscation. Such burden is coupled with a strong presumption of the correctness of the findings and conclusions of the commission, which may choose its own criteria or method of arriving at its decision, even if irregular, provided unreasonableness is not 'clearly established.' " (*Pacific Tel. & Tel. Co. v. Public Utilities Com.* (1965) 62 Cal.2d 634, 647; see *Ponderosa, supra,* 36 Cal.App.5th 999, 1016.) When conducting a reasonableness inquiry, it is the impact of the rate order that counts and, therefore, courts must consider

the *total effect* of the rate order before determining whether it is unreasonable and unjust. (*Duquesne Light Co. v. Barasch*, *supra*, 488 U.S. at p. 310.)

        3.     *Analysis*

This writ proceeding does not address a decision by the Commission that sets a telephone company's rates after applying broadband imputation. The implementing rules for the CHCF-A require the telephone companies to "periodically file general rate case applications with the Commission in order to receive CHCF-A support. (Order Instituting Rulemaking into the Review of the California High Cost Fund-A Program (June 25, 2015) Cal P.U.C. Dec. No. 15-06-048.)" (*Calaveras Telephone Co. v. Public Utilities Com.*, *supra*, 39 Cal.App.5th at p. 977.) Subsidies from the CHCF-A are a source of funds that help a telephone company meet its revenue requirement and the subsidies are part of the rate design of a telephone company. (*Ibid.*; see § 275.6, subds. (b)(3), (c)(4).)

To implement broadband imputation in a general rate case, the Commission will be required to conduct several reasonableness inquiries before reaching a decision about a telephone company's rates. For instance, paragraph 1 of the order in Decision No. 21-04-005 states that, in a general rate case of each telephone company, "all *reasonable* positive retail broadband-related revenues of the [telephone company] and its [ISP] affiliate (if such affiliate exists) (but excluding revenues derived from areas outside of the [telephone company's] telephone service territory and revenues resulting from alternative service platforms that are not based upon the [telephone company's] local exchange facilities) net of all *reasonable* broadband-related expenses of the [telephone company] and its [ISP] affiliate (if such affiliate exists) for the calendar year immediately preceding the filing of the [general rate case] application shall be imputed in the determination of rate design and California High Cost Fund-A support." Additional reasonableness standards apply. Section 275.6, subdivision (c)(2) provides that in setting rates the Commission *shall*

"afford the telephone corporation a fair opportunity to earn a *reasonable* return on its investments, attract capital for investment on *reasonable* terms, and ensure the financial integrity of the telephone corporation."  (Italics added.)

At this point, the " 'total effect' " (*Duquesne Light Co. v. Barasch*, *supra*, 488 U.S. at p. 310) of broadband imputation on the telephone companies' rates cannot be determined because the Commission has not made the foregoing reasonableness determinations and established a telephone company's rate design and CHCF-A subsidy. Consequently, we cannot determine that the rates will be so unreasonably low as to be confiscatory in violation of the telephone companies' constitutional rights.  (See *Ponderosa, supra,* 36 Cal.App.5th at pp. 1016–1018 [rejecting contention that Commission's cost of capital determination was so unreasonably low that it was confiscatory].)  As a result, the taking claim is unripe.

## DISPOSITION

The petition for a writ directing the Commission to nullify Decision No. 21-04-005 and Decision No. 21-08-042 is denied.  The Commission and TURN shall recover their costs in this original proceeding.  (Cal. Rules of Court, rule 8.493(a)(1)(A).)


FRANSON, J.

WE CONCUR:


LEVY, Acting P. J.


MEEHAN, J.

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CALAVERAS TELEPHONE COMPANY et al., <br><br> Petitioners, <br><br> v. <br><br> PUBLIC UTILITIES COMMISSION, <br><br> Respondent; <br><br> PUBLIC ADVOCATES OFFICE OF THE PUBLIC UTILITIES COMMISSION et al., <br><br> Real Parties in Interest. | F083339 <br><br> (Dec. Nos. 21-04-005 & 21-08-042) <br><br><br> **ORDER MODIFYING OPINION, DENYING REHEARING AND GRANTING PARTIAL PUBLICATION** <br> [NO CHANGE IN JUDGMENT] |

It appearing that part of the nonpublished opinion filed in the above entitled matter on December 20, 2022, meets the standards for publication specified in California Rules of Court, rule 8.1105(c), IT IS ORDERED that the opinion be certified for publication in the Official Reports with the exception of with the exception of parts I., III., IV., and V., of the Discussion.

Additionally, IT IS ORDERED that the opinion filed herein on December 20, 2022, be modified as follows:

1.    On page 2, the last two sentences of the first full paragraph are deleted and replaced with the following sentence:

> The fact a broadband-capable network can provide both types of service created a concern that subsidized infrastructure could be used to generate private, unregulated profits.

2.    On page 3, the sentence, "As explained below, we reject these arguments" is deleted and replaced with the following two sentences:

> In the published portion of this opinion, we conclude the authority granted by section 275.6 is broad enough to allow the Commission to adopt broadband imputation.  In the unpublished portions of this opinion, we reject the telephone companies' other arguments.

3.    On page 9, the following unnumbered footnote is added after the heading "I.  BASIC LEGAL PRINCIPLES"

> *  See footnote, *ante*, page 1.

4.    On page 13, the first sentence of the paragraph under heading II.A. beginning "A fundamental dispute" is deleted and replaced with the following sentence:

> A novel question of statutory interpretation presented in this appeal is whether section 275.6 authorizes the Commission to adopt broadband imputation.

5.    On page 23, the sentence "Whether this interpretation violates other statutory provisions or the California Constitution is addressed next" is deleted.

6.    On page 23, the following unnumbered footnote is added after the heading "III. SCOPE OF COMMISSION'S JURISDICTION"

> *  See footnote, *ante,* page 1.

7.    On page 26, the last sentence of the second full paragraph is deleted and the following sentence is inserted in its place:

> Consequently, the telephone companies have not carried their burden of demonstrating broadband imputation violates provisions in article XII of the California Constitution.

8.     On page 26, the third full paragraph beginning with "Consequently," is deleted it its entirety.

9.     On page 26, the following unnumbered footnote is added after the heading "IV. FEDERAL PREEMPTION"

  *  See footnote, *ante,* page 1.

10.     Starting at the end of page 32 the sentence beginning, "Stated another way," through the third full sentence on page 33 beginning, "In addition," are deleted and replaced with the following sentences:

> "Stated another way, no matter what regulatory scheme is adopted to determine the rates and subsidies for telephone service, that scheme, either explicitly or implicitly, must take a stance on what infrastructure costs are attributable to each type of service.  If the Commission is completely barred from considering the cost and revenue associated with the unregulated Internet access service, the Commission would be forced to ignore the marketplace realities of broadband's dual capabilities, which would effectively erode the Commission's authority to set reasonable rates and reasonable subsidies under the CHCF-A, thus curtailing its authority to effectively regulate the telephone companies and the provision of telephone services.  In addition, it might allow the ISP affiliate to generate profits without bearing its fair share of the cost of the infrastructure.

11.     On page 34, the following unnumbered footnote is added after the heading "V. UNCONSTITUTIONAL TAKING CLAIM IS UNRIPE"

  *  See footnote, *ante,* page 1.

12.     On page 34 the second full paragraph beginning "Broadband imputation" is deleted in its entirety.

13.     On page 34, subheading "A. Lowering Subsidies Does Not Take Private Property" along with the paragraph beginning, "A subsidy …" is deleted.

14.     On page 34, just the subheadings "B. Ratemaking" and "*1. Basic Principles*" are deleted (the paragraphs that follow remain intact).

3.

15. On page 35, just the subheading "*2. Ripeness*" is deleted (the paragraph that follows remains intact).

16. On page 36, just the subheading "*3. Analysis*" is deleted (the paragraphs that follow remain intact).

There is no change in the judgment.  Petitioners' petition for rehearing filed on January 4, 2023, is denied.

FRANSON, J.

WE CONCUR:

LEVY, Acting P. J.

MEEHAN, J.